1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17
18
19

| | |
|---|---|
| SAN DIEGO COASTKEEPER, and OUR CHILDREN'S EARTH FOUNDATION,<br><br>Plaintiffs,<br><br>v.<br><br>PICK-YOUR-PART AUTO WRECKING; AMERICAN RECYCLING INTERNATIONAL, INC.; and LKQ CORPORATION,<br><br>Defendants. | Case No.:  22-CV-1693 TWR (DDL)<br><br>**ORDER (1) GRANTING PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE, AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO PARTIALLY DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**<br><br>(ECF Nos. 52, 59-2) |

20
21
22
23
24
25
26
27
28

Presently before the Court is Defendants Pick-Your-Part Auto Wrecking, American Recycling International, Inc., and LKQ Corporation's Motion to Partially Dismiss Plaintiffs' Second Amended Complaint (ECF No. 52, "Mot."), along with Plaintiffs San Diego Coastkeeper and Our Children's Earth Foundation's Opposition to (ECF No. 59, "Opp'n") and Defendants' Reply in Support of (ECF No. 62, "Reply") the Motion.  Also before the Court is Plaintiffs' Request for Judicial Notice.  (ECF No. 59-2, "RJN.")  The Court held a hearing on July 6, 2023.  (ECF No. 64.)  Having carefully considered the Parties' arguments, the Second Amended Complaint (ECF No. 47, "SAC"), and the relevant law, the Court **GRANTS** Plaintiffs' Request for Judicial Notice and **GRANTS IN**

**PART AND DENIES IN PART** Defendants' Motion to Partially Dismiss Plaintiffs' Second Amended Complaint.

**BACKGROUND**

### I.      Factual Background[1]

Plaintiff San Diego Coastkeeper is a non-profit public benefit corporation that works to protect and restore fishable, swimmable, and drinkable water in San Diego.  (SAC ¶ 20.)  Plaintiff Our Children's Earth Foundation is a non-profit corporation that works to protect the environment, including species habitat and biodiversity in southern California.  (*Id.* ¶ 21.)  Defendants Pick-Your-Part Auto Wrecking and American Recycling International, Inc. are wholly owned subsidiaries of Defendant LKQ Corporation.  (*Id.* ¶ 2.)  Defendants are primarily engaged in the business of automotive dismantling, storage of vehicles and automotive parts, battery removal, and other associated industrial activities.  (*Id.* ¶¶ 24, 29.)

Defendants own and operate six industrial facilities in San Diego County (collectively, "the Facilities").  (*Id.* ¶ 6.)  Four of the Facilities are in Chula Vista (collectively, "Chula Vista Facilities"), and two of the Facilities are in Oceanside (collectively, "Oceanside Facilities").  (*Id.*)  The Facilities are enrolled under the State of California's National Pollution Discharge Elimination System ("NPDES") General Permit for Storm Water Discharges Associated With Industrial Activities ("General Permit").  *See* NPDES Order No. CAS000001: California State Water Resources Control Board Water Quality Order 2014-0057-DWQ, as amended in 2015 and 2018 (Order 2015-0122-DWQ and November 6, 2018, Board Amended Requirements).  (SAC ¶ 7.)  Other than as authorized by the General Permit, the Facilities "lack NPDES permit authorization for application, disposal, or discharge of any process water, wastewater, or industrial wastewater."  (*Id.* ¶¶ 23, 28.)  Dischargers under the General Permit must comply with a

---

[1]      For purposes of Defendants' Motion to Partially Dismiss, the facts alleged in Plaintiffs' Second Amended Complaint are accepted as true.  *See Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007).

variety of requirements, including but not limited to "monitoring and reporting requirements, developing and implementing adequate best management practices ("BMPs"), revising and updating the [Stormwater Pollution Prevention Plans ("SWPPPs")], developing an adequate monitoring implementation plan, [and] conducting the requisite storm water sampling." (*Id*. ¶¶ 27, 32.)

Operations at Defendants' Facilities involve several pollution-generating activities including automotive dismantling, vehicle storage and washing, battery removal and storage, removal of vehicle fluids, and hazardous waste accumulation and storage. (*Id*. ¶¶ 24–26, 29–31.) "[T]he pollutants associated with the facilities' industrial activities and materials include aluminum, copper, iron, lead, zinc, oil & grease . . ., TSS, and pH affecting substances." (*Id*. ¶¶ 26, 31.) Further, "[s]tormwater and non-stormwater discharges from the four Chula Vista Facilities flow into the Otay River, San Diego Bay, and the Pacific Ocean." (*Id*. ¶ 33.) "Stormwater discharged from the two Oceanside Facilities flows to the San Luis Rey River and the Pacific Ocean." (*Id*. ¶ 45.) Defendants' Facilities also release discharges that contain elevated levels of toxic heavy metals, oil and grease, and various petroleum hydrocarbons "onto adjacent land" and "into adjacent riparian habitat." (*Id*. ¶¶ 19, 237.)

Plaintiffs allege that heavy metals "are well-known environmental pollutants due to their toxicity, persistence in the environment, and bioaccumulative nature." (*Id*. ¶ 10.) In fact, elevated levels of "heavy metals such as iron, copper, zinc, and lead in stormwater can be toxic to aquatic organisms" including fish and benthic macroinvertebrates. (*Id*. ¶¶ 10, 12, 14.) "These heavy metals can bioaccumulate to toxic levels in aquatic animals such as fish, turtles, and other species, and have the potential to contaminate drinking water supplies." (*Id*. ¶ 13.) The negative effect of heavy metals on the benthic community and the bioaccumulation in fish can, in turn, impact birds and fauna that depend on the benthic communities to survive. (*Id*.)

Plaintiffs further allege that the stormwater discharged from Defendants' Facilities contributes to the ongoing stormwater problem in the bodies of water where those

discharges flow.  (*Id*. ¶18.)  In addition, the "large number of vehicles entering and leaving the [Facilities] track oil, grease, sediments, fine metal particulates, and other pollutants off-site and onto roads where rainfall washes these pollutants" into the Otay River, San Diego Bay, Pacific Ocean, and San Luis Rey River, as well as riparian and upland areas adjacent to the Facilities.  (*Id*. ¶¶ 25, 30, 238.)

Finally, Plaintiffs allege that they are bringing this action on their own behalf and on behalf of their adversely affected members.  (*Id*. ¶ 244.)  Their members "use and enjoy the waters into which Defendants' Facilities discharge stormwater with elevated levels of pollutants and non-stormwater discharges (NSWDs), including the Otay River, San Luis Rey River[,] and the bays and wetlands into which those waters flow, including San Diego Bay, and the Pacific Ocean."  (*Id*.)  Plaintiffs' members "use and enjoy these waters for recreational, aesthetic, restoration, conservation, educational, scientific, professional, and other purposes."  (*Id*.)  With their knowledge of the pollution concerns about Defendants' six Facilities including the degradation of the surrounding riparian ecosystem and habitat, Plaintiffs, and their members "avoid or limit touching, swimming, fishing, and engaging in other activities in and around the Otay River, San Luis Rey River, San Diego Bay, Pacific Ocean, beaches, and surrounding waters into which those waters flow when they would otherwise like to."  (*Id*. ¶ 250; *see also id*. (alleging pollution from Defendants' Facilities are impacting the Plaintiffs' use and enjoyment of the waters, bays, beaches, and surrounding ecosystems).)

The San Luis Rey River runs alongside the San Luis Rey Bike Trail, which is a 10.7 mile publicly accessible multi-use trail that provides opportunities to see the natural habitat of the region, including bird species.  (*Id*. ¶ 248.)  The trail "goes past the discharge locations of the two Oceanside Facilities."  (*Id*.)  Plaintiffs' members bike along the trail and hike "from the mouth of the river east past Interstate 5 to look for and view wildlife, including birds."  (*Id*. ¶ 249.)  The portions of the trail that Plaintiffs' members use "pass directly by the discharge points from the Oceanside Facilities and the places those discharges reach the San Luis Rey River."  (*Id*.)  Plaintiffs and their members "plan to

continue enjoying" all the activities they have engaged in around the area including hiking, biking, enjoying the natural open spaces, bird watching, and observing other fauna including fish, reptiles, and mammals.  (*Id*.)  Because of concerns that the Facilities' stormwater discharges and NSWDs have degraded the area with pollutants, including "the water, adjacent riparian areas, and surrounding ecosystems," "Plaintiffs and their members have curtailed their use of the areas in and around where the Oceanside Facilities discharge" stormwater.  (*Id*.)

Plaintiffs allege that their reduced use and enjoyment of these bodies of water and surrounding beaches is directly traceable to Defendants' stormwater discharges containing elevated levels of pollutants and unpermitted NSWDs.  (*Id*. ¶ 250.)  They further allege that unless Plaintiffs achieve the relief sought in their Second Amended Complaint, they will continue to be adversely affected.  (*Id*. ¶ 251.)  Instead, if "Plaintiffs are successful in this action . . . Defendants will be required to bring their discharges from the Facilities to waters of the United States into compliance with the [law] and thus reduce their discharges of pollutants to the affected receiving waters, and either eliminate or seek permit coverage for their [NSWDs] and unpermitted discharges."  (*Id*.)

## II.   Procedural History

Plaintiffs filed their initial Complaint in October 2022.  (ECF No. 1.)  Plaintiffs then filed a timely First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).  (ECF No. 8.)  Defendants subsequently moved to partially dismiss Plaintiffs' First Amended Complaint.  (ECF No. 11.)  In response, Plaintiffs filed a motion for leave to file a Second Amended Complaint.  (ECF No. 33.)  The Court granted Plaintiffs' request and denied Defendants' Motion to Partially Dismiss Plaintiff's First Amended Complaint as moot.  (ECF No. 46.)  Plaintiffs then timely filed their Second Amended Complaint, alleging seven causes of action under the Clean Water Act ("CWA")[2] and the Resource

---

[2]   The CWA is also known as the Federal Water Pollution Control Act Amendments of 1972.  *See Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 530 (9th Cir. 2001).

Conservation and Recovery Act ("RCRA").  (*See generally* SAC.)  Plaintiffs allege that Defendants' activities at the Facilities cause and contribute to the pollution of sensitive ecosystems throughout San Diego in violation of the CWA and RCRA.  (*Id*.)  Plaintiffs' claims are largely based on the improper handling and disposal of stormwater and non-stormwater discharges at each of the Facilities that they allege detrimentally affect the nearby receiving waters and adjacent riparian areas and land.  (*Id*.)  Plaintiffs seek declaratory and injunctive relief, as well as civil penalties.  (*Id*., Relief Requested.) Defendants move to partially dismiss Plaintiffs' Second Amended Complaint arguing (1) Plaintiffs fail to allege standing sufficient to meet Article III requirements for claims relating to the Oceanside facilities and (2) Plaintiffs' second, third, and seventh claims fail to state claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*See generally* ECF No. 52-1, "Mem.")

**LEGAL STANDARDS**

**I.   Federal Rule of Civil Procedure 12(b)(1)**

A party may challenge the Court's subject-matter jurisdiction through a motion filed pursuant to Federal Rule of Civil Procedure 12(b)(1).  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  Because "[f]ederal courts are courts of limited jurisdiction," "[i]t is to be presumed that a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Consequently, "the burden of establishing the contrary rests upon the party asserting jurisdiction."  *Id.*

"Because standing . . . pertain[s] to a federal court's subject-matter jurisdiction under Article III, [it is] properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1)."  *White*, 227 F.3d at 1242 (citing *Bland v. Fessler*, 88 F.3d 729, 732 n.4 (9th Cir. 1996)).  In fact, "[s]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III."  *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1035 (9th Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

/ / /

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) [he or she] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). And where "a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

"For purposes of ruling on a motion to dismiss for want of standing, . . . [the trial court] must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (citation omitted). "A Rule 12(b)(1) jurisdictional attack may be facial or factual. In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing *White*, 227 F.3d at 1242).

## II.   Federal Rule of Civil Procedure 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Id.* at 1242 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 677–78 (2009).  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In other words, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Id.* at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'"  *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).  "A district court does not err in denying leave to amend where the amendment would be futile."  *Id.*

## ANALYSIS

### I.    Request for Judicial Notice

"Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'"  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting Fed. R. Evid. 201(b)).  "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  *Id.* (quoting Fed. R. Evid. 201(b)(1)–(2)).  "Accordingly, '[a] court may take judicial notice of matters of public

record without converting a motion to dismiss into a motion for summary judgment.'" *Id.* (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)).  Matters of public record include records and reports of state agencies.  *See Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 866 n.1 (9th Cir. 2004); *see also Ctr. for Cmty. & Env't Just. v. Friends of Riverside Airport, LLC*, No. EDCV 17-1091 JGB (KKx), 2017 WL 10511577, at *5 (C.D. Cal. Sept. 28, 2017) ("It is well established that records, reports, and other documents on file with administrative agencies—such as the State Water Resources Control Board—are judicially noticeable.").  A court, however, "cannot take judicial notice of disputed facts contained in such public records."  *Khoja*, 899 F.3d at 999 (citing *Lee*, 250 F.3d at 689).

Here, Plaintiffs' unopposed Request for Judicial Notice asks the Court to take judicial notice of four exhibits (Exhibits B–E).  (RJN at 2.)[3]  These exhibits are (1) excerpts of the SWPPPs for each Facility; (2) excerpts of the General Permit at issue in this case; (3) excerpts of the General Permit fact sheet; and (4) excerpts of Appendix A of the Water Quality Control Plan for the San Diego Basin ("Basin Plan").  (*See id.*; ECF No. 59-2 at 7–38 ("Ex. B"); ECF No. 59-2 at 39–51 ("Ex. C"); ECF No. 59-2 at 52–61 ("Ex. D"); ECF No. 59-2 at 62–65 ("Ex. E").)

The General Permit and the General Permit fact sheet are quasi-judicial, public documents of a state agency whose accuracy cannot be reasonably questioned.  And the Basin Plan is an agency report publicly available on the Regional Water Quality Control Board's website whose accuracy cannot be reasonably questioned.  As such, Exhibits C, D, and E are judicially noticeable.[4]  *See Cal. Sportfishing Prot. All. v. River City Waste Recyclers, LLC*, 205 F. Supp. 3d 1128, 1136 (E.D. Cal. 2016) (taking judicial notice of the

---

[3]      Throughout this Order, pin citations refer to the CM/ECF pagination stamped at the top of each page.

[4]      The Parties cite to portions of the General Permit that were not included in Exhibit C.  The entire General Permit is publicly available, and the Court relies on that whole document, not just the excerpts Plaintiffs provide.

2015 General Permit and excerpts of the Sacramento River Basin Plan).  The SWPPPs are signed and certified by a legally responsible person from LKQ Corporation, (*see, e.g.*, Ex. B at 8), and then submitted to the California Stormwater Multiple Applications and Report Tracking System website and made publicly available, (*see* RJN at 4–5).  As such, Exhibit B consists of matters of public record containing facts not subject to reasonable dispute that are capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned.  Exhibit B is also the proper subject of judicial notice.  *See Cal. Sportsfishing Prot. All. v. Shiloh Grp., LLC*, 268 F. Supp. 3d 1029, 1039 (N.D. Cal. July 24, 2017) (taking judicial notice of excerpts of the defendant's SWPPP).  The Court thus **GRANTS** Plaintiffs' unopposed Request for Judicial Notice and takes judicial notice of Exhibits B, C, D, and E.

## II.   Standing Related to Oceanside Facilities

Defendants contend that Plaintiffs' CWA claims related to the Oceanside Facilities must be dismissed because Plaintiffs fail to adequately allege standing to bring those claims.  (Mem. at 26–30.)  Defendants argue Plaintiffs have not (and cannot) allege facts sufficient to show that Plaintiffs' alleged injury is traceable to any conduct by Defendants or that the alleged harm would be redressed by the relief sought.  (*Id*. at 26.)  Defendants explain that Plaintiffs cannot meet the causation element because that element requires more than a showing of "a mere exceedance of a permit limit."  (*Id*. at 28.)  In addition, Defendants contend Plaintiffs have failed to allege sufficient facts to support a connection between Defendants' discharges and the impairment of the San Luis Rey River since "the river is impaired for completely separate contaminants than what the [Second Amended Complaint] alleges the Oceanside Facilities discharge."  (*Id*. at 29.)  Defendants assert that because "of this disconnect, Plaintiffs also fail to allege facts to establish how their injuries will be redressed by a favorable decision."  (*Id*. at 27 n.17.)

Plaintiffs counter that the injury connected to the causation element is not the injury to the environment, but the injury to Plaintiffs and as such, the relevant legal question is whether the Second Amended Complaint sufficiently connects Plaintiffs' harms to

Defendants' discharges at the Oceanside Facilities.  (Opp'n at 9–10.)  Plaintiffs explain that the Second Amended Complaint adequately alleges Plaintiffs and its members "use and enjoy the San Luis Rey River and other waters into which the Oceanside Facilities discharge pollutants for recreational, aesthetic, restoration, conservation, educational, . . . and other purposes" and that this "use and enjoyment is directly harmed by the Oceanside Facilities' polluted discharges."  (Opp'n at 10–11.)

At this stage of the proceedings, the Court agrees with Plaintiffs.  "To satisfy Article III standing in a citizen enforcement action under the CWA, 'a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely . . . that the injury will be redressed by a favorable decision.'"  *Cal. Comms. Against Toxics v. Trojan Battery Co.*, No. 2:18-cv-02189-SVW-FFM, 2018 WL 8805395, at *1 (C.D. Cal. Dec. 28, 2018) (citation omitted).  Plaintiffs have standing to sue on behalf of its members if at least one of their "members would otherwise have standing to sue in [the member's] own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 917–18 (9th Cir. 2018) (citation omitted).

Defendants properly focus on the traceability and redressability elements of standing—Plaintiffs adequately allege an injury in fact through their members' reduction in the use and enjoyment of the areas around the San Luis Rey River because of their concerns about Defendants' pollution-generating activities.[5]  *See Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) ("The 'injury in fact' requirement

---

[5]     While standing is a jurisdictional prerequisite, and the Court has a duty to address it *sua sponte*, *see Bernhardt v. County of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2002), Defendants properly focus on the two elements at issue—traceability and redressability.  The Court is satisfied that the other elements discussed are met.

in environmental cases is satisfied if an individual adequately shows she has an aesthetic or recreational interest in a particular place, animal, or plant species and that that interest is impaired by a defendant's conduct."); *see id*. at 1151 ("[T]he threshold question of citizen standing under the CWA is whether an individual can show that *she* has been injured in her use of a particular area because of concerns about violations of environmental laws, not whether the plaintiff can show there has been actual environmental harm.").[6]

Traceability and redressability are closely related, so the Court will address them together. *See Nat. Res. Def. Council*, 542 F.3d at 1245. "[T]he causal connection put forward for standing purposes cannot be too speculative, or rely on conjecture about the behavior of other parties, but need not be so airtight at this stage of the litigation as to demonstrate that the plaintiffs would succeed on the merits." *Pac. Lumber Co.*, 230 F.3d at 1152. "[T]he threshold requirement of 'traceability does not mean that plaintiffs must show to a scientific certainty that defendant's effluent . . . caused the precise harm suffered by the plaintiffs' in order to establish standing." *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 995 (9th Cir. 2000) (citation omitted). Instead, to satisfy the traceability requirement, "[r]ather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." *Id.*; *see also S.F. Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 749 (N.D. Cal. 2011) ("Where more than

---

[6]     Attached to Plaintiffs' Opposition are declarations from three members of San Diego Coastkeeper that detail their use of waters and land near Defendants' Oceanside Facilities, along with their concerns about Defendants' discharge of polluted stormwater. (*See* ECF Nos. 59-3, 59-4, 59-5.) *See Nat. Res. Def. Council v. EPA*, 542 F.3d 1235, 1245 (9th Cir. 2008) ("[M]embers' statements that their use of specific waterways has been diminished due to their concerns about discharge from a particular source . . . are sufficient to establish injury in fact."). While not necessarily needed given the sufficient allegations in the Second Amended Complaint, the Court can also take those declarations into account when determining standing. *See Eden Env't Citizen's Grp., LLC v. Am. Custom Marble, Inc.*, No. 19-CV-03424-EMC, 2020 WL 733167, at *5 (N.D. Cal. Feb. 13, 2020) (noting court could consider declarations submitted in response to Rule 12(b)(1) motion); *see also McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) ("[W]hen considering a motion to dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction.").

22-CV-1693 TWR (DDL)

one potential discharger is part of the same system, a plaintiff need not show that the discharge came from a specific user.").

Plaintiffs have done that here: they allege that the various discharges from the Oceanside Facilities are causing them to reduce their use and enjoyment of the surrounding areas because, for example, the discharges harm "aquatic life and species that live in the surrounding riparian habitat that Plaintiffs and Plaintiffs' members observe [and] study" and they would like to continue recreating in the area, but "do not do so because of concern that the water, adjacent riparian areas, and surrounding ecosystems . . . contain harmful pollutants, including pollutants from the Oceanside Facilities." (SAC ¶¶ 249–50.) *See River City Waste Recyclers*, 205 F. Supp. 3d at 1147 (finding the causation element of Article III standing satisfied where the plaintiff's member declared he believed the defendant discharged pollutants in its stormwater that contributed to the contamination of fish and waters downstream and that he could no longer enjoy his activities in the relevant bodies of water as he did before); *see also Californians for Alternatives to Toxics v. Schneider Dock & Intermodal Facility, Inc.*, 374 F. Supp. 3d 897, 909–10 (N.D. Cal. 2019) (finding plaintiff had standing at summary judgment stage where plaintiff's members "derived recreational and aesthetic benefit from their use of the Bay (including areas of the Bay next to [the Facility], but that their use ha[d] been curtailed because of their concerns about pollution, contaminated fish, and the like" and where their enjoyment was "lessened due to [defendant's] alleged violations of various provisions of the Clean Water Act designed precisely to prevent the irreparable environmental degradation of the nation's waters before it occurs" (citation omitted)).

Plaintiffs have also alleged that a favorable decision would redress their injuries through alleging continuing violations of the CWA by Defendants and that if Plaintiffs are successful, Defendants will be required to bring their discharges into compliance with the CWA and RCRA. (SAC ¶ 251 ("Defendants' . . . unpermitted discharges with elevated levels of pollutants are ongoing and will continue because Defendants have not corrected the poor practices that led to these pollutant-laden discharges.") *See Sw. Marine, Inc.*, 236

F.3d at 995 (finding plaintiffs satisfied redressibility requirement because plaintiffs alleged defendant was continuing to violate its permits and they sought an injunction to halt those continuing violations).

Defendants' focus on Plaintiffs' alleged failure to connect the Oceanside Facilities' discharges to any impairments in the San Luis Rey River,[7] (*see* Mem. at 27–29), focuses on the wrong harm—it focuses on whether Plaintiff can prove the alleged violation of the General Permit's receiving waters limitations, instead of whether there is a causal connection between Plaintiffs' injury, which involves reduction in aesthetic and recreational activities, and Defendants' conduct.  In addition, Defendants move to dismiss all of Plaintiffs' CWA claims relating to the Oceanside Facilities for lack of standing, but the impairment of the San Luis Rey River as the receiving water, only appears to be relevant to claims II and III, not the rest of the CWA claims.  Defendants do not discuss the other claims, which is fatal to their argument because the "Clean Water Act . . . not only regulates actual water pollution, but embodies a range of prophylactic, procedural rules designed to reduce the risk of pollution"—"[i]t is not necessary for a plaintiff challenging violations of rules designed to reduce the risk of pollution to show the presence of actual pollution in order to obtain standing."  *Pac. Lumber Co.*, 230 F.3d at 1152 n.12.

The Court therefore finds that at this stage of the proceedings Plaintiffs have adequately alleged standing.  The Court thus **DENIES** Defendants' Rule 12(b)(1) Motion without prejudice to Defendants renewing the standing argument later in the proceedings.

---

[7]     As discussed more below, this issue also involves some factual disputes not appropriate for resolution at this stage in the proceedings.  *See infra* pp. 22–23.  In addition, Defendants' reliance on case law at the summary judgment and trial stages of litigation that requires a higher showing of evidence of standing is unhelpful at this stage in the proceedings.  (*See* Mem. at 27–28.)  Furthermore, the main case Defendants rely on to argue Plaintiffs have not alleged causation is distinguishable because in that case the unlawful discharges occurred a great distance away from the alleged receiving water and there was no evidence tracing any discharges to the defendant.  *See Cal. Comms. Against Toxics*, 2018 WL 8805395, at * 7 ("Plaintiff's evidentiary obligation to establish causation would be different if the waters where [plaintiff's member] suffered his injury were directly 'within the discharge zone' of Defendant's facility.  In such circumstances, it requires no speculation to conclude that a plaintiff's use or enjoyment of the affected water body is directly impaired by toxic discharges." (citations omitted)).

### III.   Sufficiency of Allegations in Second Amended Complaint

Defendants move to dismiss claims II, III, and VII of Plaintiffs' Second Amended Complaint for failure to state a claim.  (*See* Mem. at 10–26.)  The Court addresses each claim in turn.

### A.   Claims II and III: Violations of the Clean Water Act

Defendants move to dismiss Plaintiffs' second and third claims for relief, which concern alleged violations of the CWA.  (Mem. at 16–26.)  *See* 33 U.S.C. §§ 1311, 1342, 1365(a), (f).  The purpose of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  Pursuant to that Act, "[e]xcept as in compliance with [the CWA], the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a).  The CWA "provides for two sets of water quality measures." *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992).  First, "effluent limitations" "are promulgated by the EPA and restrict the quantities, rates, and concentrations of specified substances which are discharged from point sources." *Id*.; *see* 33 U.S.C. §§ 1311, 1314.  Second, "water quality standards" are "in general, promulgated by the States and establish the desired condition of a waterway." *Arkansas*, 503 U.S. at 101; *see* 33 U.S.C. § 1313.  The NPDES is "the 'primary means for enforcing' effluent limitations and water quality standards." *Native Vill. of Point Hope v. EPA*, No. 3:11-CV-00200-TMB, 2012 WL 12898808, at *2 (D. Alaska Sept. 14, 2012) (quoting *Arkansas*, 503 U.S. at 101). "Under this system, the EPA may issue permits allowing authorized persons to discharge pollutants, which are otherwise unlawful." *Id*. (citation omitted).  "An NPDES permit serves to transform generally applicable effluent limitations and other standards including those based on water quality into the obligations (including a timetable for compliance) of the individual discharger, and the [CWA] provide[s] for direct administrative and judicial enforcement of permits."[8] *Id*. (citation omitted); *see* 33 U.S.C. § 1365(f) (explaining an

---

[8]   Under the CWA, NPDES permits may be issued by the EPA or by states that have received authority from the EPA to issue their own permits.  *See* 33 U.S.C. § 1342(a)–(b).  The EPA has authorized

"effluent standard or limitation under [the CWA]" includes "a permit or condition of a permit issued under [the NPDES]").  As a result, a "permittee violates the CWA when it discharges pollutants in excess of the levels specified in the permit, or where the permittee otherwise violates the permit's terms."  *Nat. Res. Def. Council, Inc. v. County of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013).

Under section 1365(a) [of the CWA], "any citizen may commence a civil action" against any person "who is alleged to be in violation of (A) an effluent standard or limitation under [the CWA] or (B) an order issued by the Administrator or a State with respect to such a standard or limitation."  § 1365(a)(1).  "To state a claim under the CWA, a plaintiff must allege '(1) the ongoing addition of (2) a pollutant (3) to the navigable waters of the United States (4) from a point source (5) without a permit (or in violation of a permit).'"  *S.F. Herring Ass'n v. Pac. Gas & Elec. Co.*, 81 F. Supp. 3d 847, 860 (N.D. Cal. 2015) (citation omitted).  If, however, "a discharger is covered by a NPDES permit and complies with that permit, the permit 'shields' it from liability under the CWA."  *Alaska Cmty. Action on Toxics v. Aurora Energy Servs., LLC*, 765 F.3d 1169, 1171 (9th Cir. 2014).  "In determining compliance, the Court looks to the plain language of the Permit as it would any other contract."  *Kelly v. City of Poway*, No. 18-cv-2615-JO-DEB, 2022 WL 1524737, at *4 (S.D. Cal. May 13, 2022); *see County of Los Angeles*, 725 F.3d at 1204 ("Although the NPDES permitting scheme can be complex, a court's task in interpreting and enforcing an NPDES permit is not—NPDES permits are treated like any other contract.").  "If the language of the permit, considered in light of the structure of the permit as a whole, 'is plain and capable of legal construction, the language alone must determine the permit's meaning.'"  *County of Los Angeles*, 725 F.3d at 1204–05 (citation omitted).  "If, however,

/ / /

California to issue its own permits. *See* Cal. Water Code § 13370.  "Within California, the Regional Water Quality Control Board . . . issues, implements, and enforces permits in the San Diego region."  *San Diego Coastkeeper v. Gates*, No. 07-cv-1149 JLS (JMA), 2009 WL 10672192, at *1 (S.D. Cal. July 15, 2009).

22-CV-1693 TWR (DDL)

the permit's language is ambiguous, [the court] may turn to extrinsic evidence to interpret its terms." *Id*. at 1205.

Here, it is undisputed that the General Permit in this case is a permit issued under the NPDES and that Defendants must comply with the General Permit in order to comply with the CWA. (*See* Mem. at 12.)  The only dispute in question regarding claims II and III of Plaintiffs' Second Amended Complaint is whether Plaintiffs sufficiently allege facts to show a violation of the General Permit by the Oceanside Facilities.

### 1.   Claim II: Discharges in Violation of Water Quality Based Effluent Limitations

Plaintiffs' second claim for relief alleges that "Defendants' discharges of stormwater from the six Facilities have caused or contributed to an exceedance of one or more" of the "Water Quality Standards" discussed in Section VI of the General Permit. (SAC ¶ 266.) Defendants move to dismiss this claim as it relates to the Oceanside Facilities, contending Plaintiffs fail to allege sufficient facts to establish that any discharge from those Facilities violate an effluent standard or limitation.[9]  (*See* Mem. 16–23.)

The General Permit provides several receiving water limitations regarding a discharger's industrial stormwater discharges and authorized NSWDs.  *See* General Permit § VI.  Dischargers shall ensure that such discharges do not: (1) "*cause or contribute* to an exceedance of any applicable water quality standards in any affected receiving water";[10] (2) "adversely affect human health or the environment"; and (3) "contain pollutants in

/ / /

---

[9]      The Court only addresses alleged deficiencies in the Second Amended Complaint that Defendants have brought to the Court's attention and about which Defendants have presented an argument.

[10]      The glossary to the General Permit states "water quality standards" "[c]onsist[] of beneficial uses, water quality objectives to protect those uses, an antidegradation policy, and policies for implementation." *See* General Permit, Attachment C ("Glossary") at 9.  Furthermore, "[w]ater quality standards are established in Regional Water Quality Control Plans (Basin Plans) and statewide Water Quality Control Plans." *Id*.  "[The] EPA has also adopted water quality criteria (the same as objectives) for California in the National Toxics Rule and California Toxics Rule." *Id*.

quantities that threaten to cause pollution or a public nuisance." General Permit § VI (emphasis added).[11]

Defendants contend that Plaintiffs improperly fail to distinguish between a "receiving water limitation" and an "effluent limitation" by focusing on data regarding Defendants' discharges to allege a violation of receiving water limitations.[12] (*See* Mem. at 17.) Citing *San Diego Coastkeeper*, 2009 WL 10672192, at *5–6, and the plain language of the General Permit, Defendants urge that "the only way Plaintiffs can establish a claim based on receiving water limitations is to connect the alleged discharges and the water quality at the receiving waters," which Defendants contend Plaintiffs fail to do for the Oceanside Facilities. (Mem. at 18–19.) This is because, according to Defendants, the contaminants Plaintiffs allege are being discharged from the Oceanside Facilities are not the same contaminants for which the San Luis Rey River is impaired. (*Id.*) Defendants further contend that Plaintiffs cannot simply focus on the discharges from Defendants'

/ / /

---

[11]     Under claim II, the Second Amended Complaint also cites to section VII.B of the General Permit, (*see* SAC ¶ 268), which states, "New Dischargers applying for [Notice of Intent] coverage under this General Permit that will be discharging to a water body with a 303(d) listed impairment are ineligible for coverage unless the Discharger" has "eliminated all exposure to storm water of the pollutant(s) for which the water body is impaired," "[t]he pollutant for which the water body is impaired is not present at the Discharger's facility," or "[t]he discharge of any listed pollutant will not cause or contribute to an exceedance of a water quality standard," General Permit § VII.B.1–3. It is unclear to the Court what relevance, if any, this section of the General Permit has on claim II of the Second Amended Complaint, which focuses on that Defendants' alleged violations of the receiving water limitations listed in Section VI of the General Permit. In any event, Defendants have not presented any argument about General Permit § VII.B.

[12]     The confusion surrounding Plaintiffs' choice of words in describing a violation of the "receiving water limitations" as a violation of "water quality-based effluent limitations" is understandable since a violation of "effluent limitations" is a different section of the General Permit than a violation of the "receiving water limitations." *See* General Permit §§ V–VI. The Second Amended Complaint, however, defines "water quality-based effluent limitations" as "receiving water limitations." (*See* SAC ¶ 131 ("In addition to technology-based effluent limitations, the General Permit also contains water-quality based effluent limitations, referred to as Receiving Water Limitations."). Plaintiffs' citations to Section VI of the General Permit makes clear that claim II is based on the "receiving waters limitations" section of the General Permit, and not on the "effluent limitations" section.

Oceanside Facilities and data on those discharges to show a violation of the "receiving water limitations." (*See id.* at 17–18.) *See* General Permit, § I.E.[13]

Plaintiffs counter that the Second Amended Complaint does not rely *solely* on the Oceanside Facilities' stormwater sampling data as the basis of its allegations that Defendants are violating the receiving water limitations. (Opp'n at 26.) Instead, they argue that the Second Amended Complaint pleads that the levels of pollutants in the sampling taken from the Facilities are the same level of pollutants present in the stormwater when it reaches the receiving waters: the Oceanside Facilities are adjacent to the San Luis Rey River and the stormwater discharges from the Facilities directly enter the river, with no dilution point between the point of discharge and the receiving water. (*Id.*) They also contend the "great weight of authority" demonstrates that "sampling data from a facility's discharge point is sufficient to show a violation of the Receiving Water Limitations— without evidence of pollutant concentration at the receiving water."[14] (*Id.* at 28.) Plaintiffs further argue they have sufficiently alleged a connection between the discharge sampling data from the Oceanside Facilities and the impairment of the San Luis Rey River for (1) toxicity and (2) total dissolved solids ("TDS"). (*See* Opp'n at 29–30 (citing SAC ¶¶ 49, 134–35, 267).) First, Plaintiffs allege that Defendants' discharges containing aluminum, copper, lead, and zinc contribute to the toxicity impairment and that the General Permit

---

[13]   Section I.E. of the General Permit states:
This General Permit requires compliance with receiving water limitations based on water quality standards. The primary receiving water limitation requires that industrial storm water discharges and authorized NSWDs not cause or contribute to an exceedance of applicable water quality standards. Water quality standards apply to the quality of the receiving water, not the quality of the industrial storm water discharge. Therefore, compliance with the receiving water limitations generally cannot be determined solely by the effluent water quality characteristics.

[14]   For this proposition, Plaintiffs cite *Santa Monica Baykeeper v. Int'l Metals Ekco, Ltd.*, 619 F. Supp. 2d 936, 947–48 (C.D. Cal. 2009), *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 929 (C.D. Cal. 2009), *Cal. Sportfishing Prot. All. v. Chico Scrap Metal, Inc.*, 124 F. Supp. 3d 1007, 1021– 22 (E.D. Cal. 2015), *River City Waste Recyclers, LLC*, 205 F. Supp. 3d at 1150–51, and *Ctr. for Cmty. Action & Env't Just.*, 2017 WL 10511577, at *11.

does not require Plaintiffs to allege that the "elevated levels of toxic heavy metals in the Oceanside Facilities' discharges are the sole contaminants causing the San Luis Rey River's toxicity impairment," just that they contribute to the toxicity impairment.  (*Id*. at 28–29; SAC ¶ 135.)  Second, Plaintiffs allege that Defendants' discharges containing iron and total suspended solids ("TSS") contribute to the TDS impairment because high levels of TSS and iron "indicate and/or contribute to high concentrations of TDS."  (Mem. at 29.)

Plaintiffs assert Defendants' arguments also fail because Plaintiffs' Second Amended Complaint not only alleges a violation of the first receiving water limitation, but also alleges a violation of the second and third receiving water limitations—that the discharges adversely affect human health or the environment and contain pollutants in quantities that threaten to cause pollution or a public nuisance.  (*Id*. at 28–29 (citing SAC ¶¶ 10–15, 135, 137–38).)  Finally, Plaintiffs assert that Defendants' arguments involve factual issues not appropriate for resolution on a motion to dismiss.  (*Id*. at 30.)

Regarding the toxicity listing, Defendants contend that while copper, lead, and zinc are listed as toxic under the California Toxics Rule ("CTR"), so are 123 other chemicals, which implies that "it is clearly not the intent of the CWA that a listing for toxicity enables a party to sue a discharger for any of the 123 listed toxic chemicals or anything else a plaintiff can claim is toxic."  (Mem. at 21.)  Further, toxicity under the Basin Plan is not defined based on the CTR, whereas the Basin Plan's section on "Toxic Pollutants" does explicitly discuss the CTR.  (*Id*.)  Finally, "the data available on the San Luis Rey River strongly suggests that bacteria, pesticides, and nutrients contribute to its listing for toxicity—not aluminum, copper, lead, or zinc."  (*Id*. at 22.)

As to the TDS listing, Defendants contend that the definition of TDS explicitly excludes TSS, and iron is regulated as a wholly distinct contaminant, so neither could contribute to the TDS impairment listing.[15]  (*Id*. at 20.)  Finally, Defendants argue that

---

[15]     The Second Amended Complaint defines TDS as "the amount of organic and inorganic materials such as metals, minerals, salts and ions that are dissolved in a particular volume of water."  (SAC ¶ 49.)

"Plaintiffs' interpretation of TDS would eviscerate the regulatory framework for TDS as a contaminant and would effectively allow claims to be brought relating to TDS based upon any dissolved contaminant alleged to be discharged." (*Id*.) Defendants provide the following table to show the differences between the discharges from the Oceanside Facilities and the pollutants that have impaired the San Luis Rey River:

| Contaminants for which the receiving waters are impaired | Contaminants alleged discharged from the Oceanside Facilities |
| --- | --- |
| Benthic community effects | [TSS] |
| Bifenthrin | pH affecting substances |
| Chloride | Oil & grease |
| Dissolved oxygen | Aluminum |
| Nitrogen | Iron |
| Phosphorus | Copper |
| Pyrethroids | Zinc |
| Totals dissolved solids | Lead |
| Toxicity | |

(Mem. at 19.)

Here, accepting the allegations of the Second Amended Complaint as true as the Court must at this stage of the proceedings, Plaintiffs plausibly allege CWA violations based on violations of receiving water limitations under the General Permit. Based on the plain language of the General Permit, Defendants are correct that "compliance with the receiving water limitations *generally* cannot be determined *solely* by the effluent water quality characteristics." General Permit, § I.E (emphases added). Based on that language, Plaintiffs cannot rely solely on the effluent sampling data and must connect the alleged discharges to the water quality at the receiving waters—at least as to the receiving water limitation listed General Permit § VI.A.[16] *See id*.

_____

Defendants, instead rely on a definition Plaintiffs used in prior motion practice, (Mem. at 20 & n.11 (citing ECF No. 35 at 22 n.18)). But the Court, at this stage, must accept the allegations in the Second Amended Complaint as true, and definitions used in prior motion practice are not before the Court.

[16]   Defendants provide no argument about the allegations in the Second Amended Complaint that address the other two ways to show a violation of the receiving water limitations. *See* General Permit

Even so, Plaintiffs still plausibly allege a connection between the effluent sampling data at the Oceanside Facilities and the impairment of the San Luis Rey River for toxicity and TDS.  Regarding the toxicity listing, "[t]he Facilities' own self-reported monitoring results show that the discharges entering the . . . San Luis Rey River from the Facilities contain elevated levels" of aluminum, copper, lead, zinc, and TSS.  (SAC ¶ 267; *see id*. ¶ 135.)  "The self-reported data show that each Facility has discharged elevated concentrations of toxic metals in excess of CTR standards."  (*Id*. ¶ 135.)  The Second Amended Complaint also alleges that these toxic metals *contribute* to the toxicity impairment of the San Luis Rey River and effect the beneficial uses of the river.  (*Id*. ¶ 138.)  This is sufficient at this stage of the proceedings.  *See* General Permit § VI (the General Permit's receiving water limitations prohibit "industrial storm water discharges and authorized NSWDs" that "cause *or contribute* to an exceedance of any applicable water quality standards in any affected receiving water" (emphasis added)).  Defendants' argument that the river's toxicity listing is likely based on other pollutants besides copper, iron, zinc, and aluminum is a factual matter not suitable for resolution at this stage of the proceedings.  (*See* Mem. at 21–22.)  And Defendants have not adequately supported their argument that "toxicity" cannot be linked to the CTR.  (*See id*. at 20–21.)[17]  The Court

_____

§ VI.B–C (prohibiting industrial stormwater discharges and NSWDs that adversely affect human health or the environment or that contain pollutants in quantities that threaten to cause pollution or a public nuisance).  The Court's findings therefore do not apply to those subsections of the General Permit.  For example, the Court declines to decide whether there must be a connection between the discharge data and the receiving water pollution to allege a violation of General Permit § VI.C given the plain language of the General Permit.  *See* General Permit § VI.C ("Dischargers shall ensure that industrial storm water discharges and authorized NSWDs do not contain pollutants in quantities that threaten to cause pollution or a public nuisance."); *see also id*. § I.E (noting the primary receiving water limitation is found in General Permit § VI.A and then highlighting that "compliance with the receiving water limitations *generally* cannot be determined solely by the effluent water quality characteristics" (emphasis added)).

[17]     In fact, the cases Plaintiffs rely on, *see supra* p. 19 n.14, support the conclusion that the CTR is an applicable water quality standard under the Receiving Water Limitation section of the General Permit such that a violation of the CTR is a violation of that section of the General Permit.  *See, e.g.*, *Santa Monica Baykeeper*, 619 F. Supp. 2d at 929.

would need substantially more information about the interplay between the definition of "toxicity" and the CTR to make any finding about their relationship.

In addition, as to the TDS listing, the Second Amended Complaint alleges that TSS and iron contribute to the TDS impairment because high levels of TSS and iron "indicate and/or contribute to high concentration of TDS." (SAC ¶134; *see id*. ¶ 135 ("Each of the Facilities has repeatedly discharged high concentrations of iron and TSS in excess of their respective Water Quality Objectives.").) While the General Permit itself does not provide a definition of TDS, Plaintiffs allege that TDS is "the amount of organic and inorganic materials such as metals, minerals, salts and ions that are dissolved in a particular volume of water." (SAC ¶ 49.) Defendants' argument that, according to Plaintiffs' prior definition of TDS in the last round of motion practice, TSS cannot contribute to TDS, (Mem. at 20), is again a factual matter not suitable for resolution on a motion to dismiss. And Defendants' argument that TDS is not to be viewed through any component parts but must be looked at a whole is not sufficiently supported for the Court to make a determination one way or the other—Defendants cite no authority to support that proposition. Based on the facts as alleged in the Second Amended Complaint with all inferences drawn in Plaintiffs' favor, Plaintiffs have sufficiently alleged iron, as a metal, could plausibly contribute to TDS.

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Dismiss Plaintiffs' second claim for relief.

2.      *Claim III: Discharges in Violation of Discharge Prohibitions*

Defendants also move to dismiss Plaintiffs' third claim for relief, which alleges that "Defendants have discharged and continue to discharge unauthorized NSWDs from the Facilities" in violation of the discharge prohibitions under the General Permit. (SAC ¶ 276; *see also id*. ¶ 141.) The General Permit defines NSWDs as "[d]ischarges that do not originate from precipitation events[, including] but not limited to, discharges of process water, air conditioner condensate, non-contact cooling water, vehicle wash water, sanitary wastes, concrete washout water, paint wash water, irrigation water, or pipe testing water."

General Permit Glossary at 5.  In other words, NSWDs are "discharges of liquids or materials other than storm water."  General Permit § III.B.  The General Permit provides several prohibitions regarding NSWDs.  First, unauthorized NSWDs that are discharged "either directly or indirectly to waters of the United States" and are not "authorized by another NPDES permit" are prohibited.  *Id.*  Second, authorized NSWDs that "contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of the Water Code" are prohibited.  *Id.* § III.C.  Third, "[d]ischarges that violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans (Basin Plans), or statewide water quality control plans and policies" are prohibited.  *Id.* § III.D.  "Measures to control sources of unauthorized NSWDs such as spills, leakage, and dumping, must be addressed through the implementation of Best Management Practices."  *Id.* § I.C.28.

Defendants contend that Plaintiffs' CWA claim based on NSWDs fails because the discharges alleged by Plaintiffs do not qualify as NSWDs.  (Mem. at 23.)  Instead, claim III is "premised on the false allegation that contamination sources in stormwater should be treated as independent discharges from the stormwater itself."  (*Id.*)  For example, the General Permit requires a discharger to take particular actions when certain contaminants exceed certain standards, such as a numeric action level ("NAL") or a total maximum daily load numeric action level ("TNAL").  (*Id.* at 24.)  For NSWDs, Defendants argue, "the relevant standard is essentially set at zero" so "discharges containing any level of a contaminant over zero" is considered a "violation."  (*Id.*)  Therefore, Defendants assert that contaminants subject to the NAL/TNAL process must be distinct from NSWD contaminants, otherwise the NAL/TNAL process would be rendered meaningless.  (*Id.*)  Defendants further contend that "all of Defendants['] contaminants are subject to the NAL/TNAL process" because they "are already covered under the Stormwater Pollution Prevention plan for each facility" so "none of them qualify as NSWDs."  (*Id.* at 24–25.)  Defendants also argue that the "spills of fluids and leaks" on which Plaintiffs base their

/ / /

NSWDs claim are only allegedly connected to the threatened waterbodies through "stormwater taking [the] pollutants from those sites to those waterbodies." (*Id*.)

Plaintiffs counter that Defendants ignore the alleged "NSWDs that do not involve any commingling with stormwater, such as offsite tracking of pollutants." (Opp'n at 30.) To support the plausibility of their claim, Plaintiffs refer to Defendants' own SWPPPs "which admit that sources of potential unauthorized NSWDs include 'track out' from numerous areas of the Facilities and spills of numerous liquids." (*Id*.) Further, Plaintiffs note, (*see id*.), that the plain language of the General Permit fact sheet states that "unauthorized NSWDs can discharge to the storm drain system during dry weather as well as during a storm event (commingled with stormwater discharge), (Ex. D at 57 (General Permit Fact Sheet § II.C)). "[Those] NSWDs can consist of, but are not limited to . . . fluid, particulate, or solid materials that have spilled, leaked, or been disposed of improperly." (*Id*.) Therefore, Plaintiffs argue, the commingling of the NSWDs with stormwater does not convert the NSWDs into industrial stormwater discharges. (*See* Opp'n at 30–31.) Lastly, Plaintiffs argue that treating the alleged discharges as NSWDs is not inconsistent with the General Permit structure because the discharges contain contaminants like "polycyclic aromatic hydrocarbons [and] many other substances contained in the motor oil, hydraulic fluid, and other vehicle fluids being spilled" that "are not covered by the General Permit or the Facilities' SWPPPs." (*Id*. at 31.)

Here, accepting all factual allegations as true, Plaintiffs plausibly allege CWA violations based on NSWDs in violation of at least one discharge prohibition under the General Permit. The Second Amended Complaint alleges that a "large number of vehicles entering and leaving" the Facilities track "oil, grease, sediments, fine metal particulates, and other pollutants off-site and onto roads where rainfall washes these pollutants into the" receiving waters. (SAC ¶¶ 25, 30.) And during inspections at each of the Facilities, Plaintiffs observed "multiple spills or leaks of fluids" on the ground. (SAC ¶ 143.) Plaintiffs allege that "[e]ven when these fluids do not immediately discharge from the site, during a rain event[] [the] fluids are mobilized by stormwater" which constitutes the

commingling of non-stormwater with stormwater. (*Id.* (highlighting that during an inspection at one of the Oceanside Facilities, there was light rain and "Plaintiffs observed the spilled or leaked fluids with an oily sheen being mobilized by stormwater").) Defendants' SWPPPs indicate all of the following from various activities at the Facilities "have the potential to result in unauthorized NSWDs" in addition to "impact[ing] stormwater": spills and leaks, "[t]rack out," and loading and unloading." (Ex. B at 10–12, 15–17.)

The Court notes that Plaintiffs' NSWD claim is based primarily on "fluid spills and leaks" that are "mobilized by stormwater," but also encompasses the off-site tracking of pollutants that are then washed into the receiving waters by rainfall. (SAC ¶¶ 25, 30, 143, 276.) Based on the plain language of the permit, it appears that pollutants tracked off-site and washed into the receiving waters sufficiently fits the definition of NSWDs to plausibly support a claim for a violation of section III.B of the General Permit. The Parties, however, do not provide the Court with enough information to meaningfully determine where to draw the line between what constitutes stormwater and what constitutes a NSWD when pollutants are spilled on-site and mobilized by stormwater. Each Party asks the Court to adopt its interpretation of the General Permit without citing to any authority. It is therefore premature for the Court to rule on this issue.[18]

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Dismiss Plaintiffs' third claim for relief for violations of General Permit § III.B. As for violations of General Permit § III.C–D, the Parties do not clearly and adequately address the issues,

---

[18] The Court notes that the commingling of such spills and leaks with stormwater does not *per se* disqualify them as NSWDs based on the plain language of the General Permit, *see* General Permit Fact Sheet § II.C, but the Court cannot determine from the information presented where that line should be drawn. Nor can the Court meaningfully distinguish between NSWDs and the pollutants regulated under the NAL/TNAL process without further information or argument. Plaintiffs seem to concede that pollutants that are regulated under NAL/TNAL process cannot be categorized as an NSWD by not addressing the issue (*see* Opp'n at 31), and Defendants do not address Plaintiffs' argument that some of the alleged pollutants are do not fall within that process, (*see id.*; Reply at 14).

22-CV-1693 TWR (DDL)

so the Court **DENIES** Defendant's Motion to Dismiss Plaintiffs' third claim for relief to the extent it relies on General Permit § III.C–D.  *See IQVIA Inc. v. MedImpact Healthcare Sys., Inc.*, No. 21-CV-2081-GPC-DEB, 2022 WL 6258369, at *14 (S.D. Cal. Oct. 7, 2022) (denying the defendants' motion to dismiss a particular claim where the parties' positions were unclear, and the parties' arguments lacked a full legal analysis).

### B.  Claim VII: Violations of the Resource Conservation and Recovery Act

Defendants move to dismiss Plaintiffs' seventh claim for relief for violations of the Resource Conservation and Recovery Act ("RCRA").  (*See* Mem. at 10–16.)  *See* 42 U.S.C. § 6972(a)(1)(B).  "RCRA has a different focus than the CWA."  *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1089 (9th Cir. 2017).  It "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste."  *Id.* (citation omitted).  RCRA was enacted to "eliminate[] the last remaining loophole in environmental law"—"that of unregulated land disposal of discarded and hazardous wastes."  *Id.* (citation omitted).  To establish RCRA liability under 42 U.S.C. § 6972(a)(1)(B), Plaintiffs must plausibly allege: "(1) that the defendant 'ha[s] contributed to the past or [is] contributing to the present handling, treatment, transportation, or disposal' of certain material; (2) that this material constitutes 'solid waste' under RCRA; and (3) that the solid waste 'may present an imminent and substantial endangerment to health or the environment.'"  *Cal. River Watch v. City of Vacaville*, 39 F.4th 624, 629 (9th Cir. 2022) (citation omitted).

Defendants do not meaningfully dispute the first and third elements.[19]  Instead, Defendants seek to dismiss Plaintiffs' RCRA claim because: "(1) Defendants' discharges are excluded from the definition of 'solid waste' under RCRA and (2) Defendants'

---

[19]    In a footnote Defendants state, "Nothing in the SAC supports the conclusion that any incidental tracking rises to a discharge of sufficient quantity to result in an imminent and substantial endangerment." (Mem. at 13 n.5.)  But Defendants fail to develop this argument.  As such, the Court declines to spend time reviewing it.  *See John-Charles v. California*, 646 F.3d 1243, 1247 n.4 (9th Cir. 2011) (stating that where party "has failed to develop any argument" on an issue, the party has waived the argument); *see also Twilio, Inc. v. Telesign Corp.*, 249 F. Supp. 3d 1123, 1162 (N.D. Cal. 2017) (same).

discharges fall under RCRA's anti-duplication provision and thus are not covered by RCRA." (Mem. at 10.)

### 1.   Discharges Constituting Solid Waste

Under RCRA's statutory scheme, "solid waste" is defined as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities."  42 U.S.C. § 6903 (27).  "Solid waste," however, does not include "industrial discharges which are point sources subject to permits under section 1342 of [the CWA]."  *Id.*; *see Cmty. Ass'n for Restoration of Env. Inc. v. Wash. Dairy Holdings LLC*, No. 1:19-CV-3110-TOR, 2019 WL 13117758, at *7 (E.D. Wash. Oct. 24, 2019) ("RCRA excludes from the definition of solid waste 'solid or dissolved material in . . . industrial discharges which are point sources' under the Clean Water Act."); *Humboldt Baykeeper v. Union Pac. R. Co.*, No. C 06-02560 JSW, 2006 WL 3411877, at *6 (N.D. Cal. Nov. 27, 2006) ("The CWA only regulates discharges from point sources.").[20]  "The purpose of the [industrial discharge exclusion] is to avoid duplicative regulation, not to create a regulatory hole through which billions of gallons of hazardous wastes can be pumped into the earth without any controls."  *Inland Steel Co. v. EPA*, 901 F.2d 1419, 1423 (7th Cir. 1990).

Here, it is undisputed that the General Permit in this case is "an NPDES permit applicable to [Defendants'] facilities" and that Defendants' facilities "are industrial." (Mem. at 12.)  Defendants contend that "all of Defendants' discharges are industrial discharges subject to an NPDES permit," and are thus "excluded from the RCRA definition of solid wastes."  (*Id.* at 13.)  Defendants further contend that their stormwater discharges

---

[20]   Under the CWA, a "point source" "means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362 (14).

and any alleged NSWDs are "explicitly and clearly subject to the General Permit," and that the "SAC recognizes as much by having all of its CWA claims based on violations of the General Permit." (*Id.*)  *See, e.g.*, *Williams Pipe Line Co. v. Bayer Corp.*, 964 F. Supp. 1300, 1327–29 (S.D. Iowa 1997) (finding that "involuntary leaks and spills of petroleum at [the defendant's] facility" were excluded from the definition of "solid waste" since they were point source discharges subject to an NPDES permit); *see also Coldani v. Hamm*, No. S-07-660 RRB EFB, 2007 WL 2345016, at \*10 (E.D. Cal. Aug. 16, 2007) (finding that "a concentrated animal feeding operation discharging solid waste (i.e., animal waste) into navigable waters from a point source" is "subject to a NPDES permit" and thus "excluded from the definition of 'solid waste' under [RCRA]").  In addition, Defendants argue that the remaining alleged "unpermitted discharges," such as tracking, "also do not qualify as solid waste" because "tracking is already directly regulated under the General Permit." (Mem. at 12–13.)

Plaintiffs recognize that many of the discharges from Defendants' Facilities are subject to the CWA and are excluded from RCRA's definition of solid waste, but they contend not all the discharges are excluded.  (Opp'n at 18.)  Instead, Plaintiffs argue, all discharges that do not meet the CWA statutory prerequisites, and are therefore not subject to the General Permit, count as solid waste under RCRA.  (*Id.* ("[O]nly those discharges of pollutants from point sources that reach waters of the United States are subject to permits under [the CWA], and thus excluded from RCRA's definition of 'solid waste.'"); *see also* SAC ¶ 297 ("Pollutant-laden storm water, pollutant-laden non-storm water, and unpermitted discharges from [] Defendants' Facilities that are not industrial discharges which are point sources subject to permits under section 1342 of Title 33 constitute 'solid waste.'").)  *See Cmty. Ass'n for Restoration of Env. Inc.*, 2019 WL 13117758, at \*7 (finding

/ / /

/ / /

/ / /

/ / /

Defendants' discharges of solid waste to groundwater from their dairies were "not necessarily excluded from RCRA liability" based on the industrial discharge exclusion).[21]

Plaintiffs are correct. The industrial discharge exclusion "is for discharges subject to the [NPDES] permit requirements, . . . not for possession of a permit as such." *Inland*, 901 F.2d at 1422. Therefore, Defendants are not automatically exempt from RCRA liability simply by having an NPDES permit for certain discharges; "[t]hey must be *required* by the [CWA] to have a permit" for the discharges at issue. *Id.*; *see Cmty. Ass'n for Restoration of Env. Inc.*, 2019 WL 13117758, at *7 ("Since NPDES authorizes discharges to surface water but not to groundwater, the alleged groundwater discharges at issue in this case are not necessarily excluded from RCRA liability."). Under the CWA, Defendants' must have "(1) discharged, i.e., added (2) a pollutant (3) *to navigable waters* (4) from (5) a point source" for such discharges to be subject to the CWA permit requirements. *Comm. To Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993) (emphasis added). The Second Amended Complaint includes allegations that Defendants' six Facilities have discharged pollutant-laden stormwater, pollutant-laden non-stormwater, and unpermitted discharges that contain elevated levels of toxic heavy metals, oil and grease, and various petroleum hydrocarbons "onto adjacent land" and "into adjacent riparian habitat." (SAC ¶¶ 19, 237.) Plaintiffs also allege that the

---

[21] Plaintiffs also rely on *Aurora Energy Services, LLC* to argue that Defendants' "pollutant-laden NSWDs and unpermitted discharges are not subject to the General Permit because the plain terms of the General Permit prohibit [Defendants'] NSWDs and unpermitted discharges." (Opp'n at 20.) Plaintiffs, however, overstate the applicability of the holding in *Aurora Energy Services, LLC* to the issue before the Court. In that case, the Ninth Circuit found that the defendant's discharges were not "shielded from [CWA] liability" because such discharges were expressly prohibited by the General Permit. *Aurora Energy Servs., LLC*, 765 F.3d at 1174. The expressly prohibited discharges were found not to be "covered" by the General Permit, meaning that the discharges were therefore violations of the General Permit. *Id.* at 1171–74. *Aurora Energy Services, LLC* does not stand for the proposition that the discharges were not subject to the General Permit altogether for purposes of RCRA's industrial discharge exclusion. Instead, discharges that are in violation of the General Permit are still subject to the General Permit. *See, e.g.*, *New York v. PVS Chems., Inc.*, 50 F. Supp. 2d 171, 178 (W.D.N.Y. 1998) (finding that "discharges [were] 'point source discharges subject to permit' under the CWA, whether or not they [were] within effluent levels set in the permit").

"adjacent riparian areas" and "beaches provide habitat to a great diversity of marine life" and that the elevated levels of pollutants in Defendants' discharges present an imminent and substantial endangerment to "local vegetation, invertebrates, insects, fish, birds, and other wildlife in and around these areas" as well as endanger the health and well-being of the "people who use, work, or recreate in these areas." (*Id.* ¶¶ 19, 240–42.)  For example, "these pollutant discharges strain the ecosystems on which numerous species, some of which are endangered, depend upon for survival." (*Id.* ¶ 242.)

Because the CWA requirements involve discharges from point sources to navigable waters, Plaintiffs' allegations regarding discharges to the various land areas are sufficient to allege that some of the discharges from Defendants' facilities are not excluded from RCRA liability and fall within the definition of solid waste.  The Court therefore **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Partially Dismiss based on Defendants' argument that the Facilities' discharges are excluded from RCRA's definition of solid waste.  The Motion is **GRANTED WITH PREJDUICE** as to all discharges covered by the General Permit and **DENIED** as to discharges not covered by the General Permit.[22]  *See Water Keeper All. v. U.S. Dep't of Def.*, 152 F. Supp. 2d 163, 170 (D.P.R. 2001) (dismissing plaintiff's RCRA claims "only to the extent that they rel[ied] on discharges of solid waste that [were] covered by Defendants' NPDES permit").

### 2.   *Non-Duplication Provision*

Defendants also contend that Plaintiffs' RCRA claim fails because "Defendants' discharges fall under RCRA's anti-duplication provision and thus are not covered by RCRA." (Mem. at 10.)  RCRA is inapplicable to "any activity or substance which is subject to the [CWA, among other named Acts] except to the extent that such application (or regulation) is not inconsistent with the requirements of such Acts."   42 U.S.C. § 6905(a).  RCRA does not define the term "inconsistent," but the Ninth Circuit has

---

[22]    Plaintiffs in fact agree "to explicitly limit the RCRA claim to [the] non-CWA-regulated discharges." (Opp'n at 18.)

adopted the Fourth Circuit's definition: "the 'CWA must require something fundamentally at odds with what RCRA would otherwise require' to be 'inconsistent' for the purposes of RCRA's anti-duplication provision." *Pac. Gas & Elec. Co.*, 874 F.3d at 1095 (quoting *Goldfarb v. Mayor of Baltimore*, 791 F.3d 500, 510 (4th Cir. 2015)). Therefore, "RCRA's anti-duplication provision does not bar RCRA's application unless that application contradicts a specific mandate imposed under the CWA." *Id.*; *see also id.* at 1096 ("If RCRA's application were prohibited as to all matters *potentially* regulable under the CWA, . . . the integration clause in RCRA . . . would serve little purpose."). "[C]ourts generally have held that there is no 'inherent inconsistency of applying RCRA to activities already regulated by [one of the statutes listed in RCRA]." *Id.* at 1096; *see also id.* at 1097 ("[T]he potential for inconsistent overlap is insufficient; only an actual, and actually inconsistent, requirement triggers the RCRA anti-duplication provision.").

Defendants contend that RCRA's anti-duplication provision applies to Defendants' discharges because "through the General Permit, the CWA imposes specific statutory requirements on Defendants' discharges." (Mem. at 15.) With respect to the stormwater discharges, Defendants contend that Plaintiffs' attempt "to hold Defendants liable for stormwater discharges regardless of whether they are in compliance with the General Permit" contradicts "General Permit sections on Effluent Limitations, Receiving Water Limitation, Total Maximum Daily Loads, and more." (*Id.*) Defendants point to the "iterative process envisioned by the Exceedance Response Actions ("ERA") section of the General Permit" "by which dischargers improve their technology over time if necessary" according to the statutory scheme set out by the CWA. (*Id.*) With respect to the NSWDs, Defendants contend that "the General permit directly regulates and prevents NSWDs except in limited contexts." (*Id.*) As to the unpermitted discharges, such as tracking, Defendants contend that "the General Permit already requires dischargers to clean and dispose of tracked materials and to minimize or prevent material tracking." (*Id.*)

Plaintiffs respond that Defendants' explanation that the General Permit contains general requirements "proves nothing in terms of inconsistency." (Opp'n at 23.) Plaintiffs

contend that if the Court were to adopt Defendants' theory, "there would never be a case where RCRA could apply to discharges also governed by the CWA." (*Id.*)   As to Defendants' discussion of the ERA, Plaintiffs counter that the ERA process is not "an exclusive remedy that prohibits a Court from imposing other obligations as a remedy under other law" considering that "even full compliance with the ERA process does not shield a discharger from potential liability for violating other requirements of the General Permit, much less RCRA." (*Id.* at 24.)   Finally, Plaintiffs note that their RCRA claim focuses on discharges that are beyond the scope of the General Permit, for example, "because they do not involve discharges to waters of the United States." (*Id.* at 25.)

While it is true that the General Permit imposes statutory requirements on at least some of Defendants' stormwater, non-stormwater, and unpermitted discharges, Defendants fail to explain how such statutory requirements are fundamentally at odds with what RCRA would otherwise require. *See Goldfarb*, 791 F.3d at 510 (finding dismissal per RCRA's anti-duplication provision improper because "more was required" to show inconsistency than a showing that the defendant's activity was already being regulated under the CWA). Defendants' contention that Plaintiffs' RCRA claim is inconsistent with various sections of the General Permit is insufficient without a greater showing or explanation of that alleged inconsistency. (*See* Mem. at 15.)   Defendants also do not explain why the anti-duplication provision would apply to Plaintiffs' RCRA claims that are not regulated by the CWA.   Because the Court has dismissed Plaintiffs' RCRA claim to the extent it relies on discharges of solid waste covered by Defendants' NPDES permit, a finding by the Court that RCRA's anti-duplication provision is inapplicable will not result in an overlap of regulatory schemes in this case.

The Court therefore finds that RCRA's anti-duplication provision does not apply to Plaintiffs' limited RCRA claim and **DENIES** Defendants' Motion to Partially Dismiss to the extent it relies on such an argument.

/ / /

/ / /

22-CV-1693 TWR (DDL)

1

## CONCLUSION

2          For the foregoing reasons, the Court **GRANTS** Plaintiffs' Request for Judicial

3   Notice and **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss

4   Claims II, III, and VII of Plaintiffs' Second Amended Complaint.  This action shall proceed

5   as to all remaining claims.

6          **IT IS SO ORDERED.**

7   Dated:  July 31, 2023

8                                                                    _____

9                                                                    Honorable Todd W. Robinson
                                                                     United States District Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22-CV-1693 TWR (DDL)